# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

MIMICS, INC., RICHARD WILDGRUBE
and MARGARET WILGRUBE, individually,

       Plaintiffs,

vs.

                                     CIV No. 99-00839 MV/ACT

THE VILLAGE OF ANGEL FIRE,
CHARLES HASFORD, individually,
MARY FRANCES McKINLEY,
individually, and GARY STANSBURY,
individually,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendants Village of Angel Fire, Mary

Frances McKinley and Gary Stansbury's Motion for Summary Judgment **[Doc. No. 130]** and

Memorandum in Support **[Doc. No. 131]**; Defendant Charles Hasford's Motion for Summary

Judgment **[Doc. No. 194]** and Memorandum in Support **[Doc. No. 195]**; Plaintiffs' Motion for

Partial Summary Judgment **[Doc. No. 190]** and Memorandum in Support **[Doc. No. 192]**; and

Defendant Charles Hasford's Partial Motion to Dismiss Amended Complaint **[Doc. No. 118]** and

Memorandum in Support **[Doc. No. 119]**.  The Court, having considered the motions, briefs,

relevant law and being otherwise fully informed, finds that Defendants Village of Angel Fire,

Mary Frances McKinley and Gary Stansbury's Motion for Summary Judgment will be

**GRANTED in part** and **DENIED in part**; Defendant Charles Hasford's Motion for Summary

Judgment will be **DENIED**; Plaintiffs' Motion for Partial Summary Judgment will be

**GRANTED**; and Defendant Charles Hasford's Partial Motion to Dismiss Amended Complaint will be **DENIED**.

## BACKGROUND

Plaintiffs Richard and Margaret Wildgrube are residents of the Village of Angel Fire, New Mexico, which had approximately 1600 residents when the events underlying the present lawsuit occurred. They had moved MIMICS, Inc., their family-owned software company, to Angel Fire in 1990.

The named defendants are also residents of the Village of Angel Fire. In 1996, Bob Morrow was a member of the Homeowners Association of Racquet Club Commons (RCC), located in Angel Fire. RCC is located in an area that has been zoned R-3, Residential-Multiple Family.[1] Morrow knew the Wildgrubes socially and professionally.

In 1996, RCC leased space to Morrow. Morrow knew the Wildgrubes were interested in relocating their business and suggested they sublease the RCC space from him. Morrow sought and received permission from the Homeowners Association of RCC to sublease the space to MIMICS. Although the space had once housed a restaurant and bar, it had been unoccupied for some time when RCC leased it to Morrow.

Between mid-1995 and October 1996, Morrow served as a Commissioner on Angel Fire's Planning and Zoning Commission (P&Z or Commission). In May or June 1996, Morrow raised the issue of MIMICS's occupancy at RCC at a P&Z meeting. The members of the Commission

---

[1]The purpose of R-3 zones is "to provide areas for more intensive development than allowed in the R-1 or R-2 Districts, along with customary accessory use, but to carefully monitor such development so that it blends into its neighborhood context." Village of Angel Fire, N.M., Zoning and Land Use Ordinance 88-11, 11 (March 1989).

agreed informally that no variance was needed to sublease the R-3 zoned space to a software company.  No minutes were kept of this discussion.  The Village issued MIMICS a 1997 business license to operate at RCC.

MIMICS moved into the RCC space in June or July 1996.  Although no written lease was executed, Morrow and the Wildgrubes understood that MIMICS would be located at RCC temporarily, while Morrow's construction company continued to work on a permanent office building.

Charles Hasford was Angel Fire's Building inspector until January 23, 1997 and, as such, was authorized to enforce Village codes and ordinances.  For at least the last several months of his term as building inspector, Hasford also held a contractor's license and owned Angel Fire Lock & Key.

In October 1996, Morrow was appointed by the Mayor to the Village Council when a vacancy arose due to a councilmember's departure mid-term.  Mary Frances McKinley and Gary Stansbury were serving as elected councilmembers at that time.  Plaintiffs contend that a political divide eventually emerged among members of the Council, with McKinley and Stansbury in one camp and Morrow in another.  Plaintiffs further assert that Hasford was aligned with the former two, while Plaintiffs stood by Morrow.  Plaintiffs allege that their association with Morrow prompted the defendants to harass them, and it is this discriminatory and allegedly unconstitutional conduct that forms the basis of Plaintiffs' lawsuit.

Plaintiffs claim that Hasford abused his position as building inspector by taking legally unauthorized and unjustified action targeting them and their business.  In part, Plaintiffs believe Hasford's entries into the MIMICS offices on December 20, 1996 and January 16, 1997 were

prompted by his hostility towards them because of their affiliation with Morrow, as well as their

public criticism of his work.  The parties agree that, on December 20, 1996, at approximately

5:30 p.m., Hasford entered the office through a back door without having obtained a warrant or

Plaintiffs' consent and without announcing his presence.  Plaintiff Margaret Wildgrube, who was

in the office at the time, discovered Hasford in a rear portion of the office.  She was

uncomfortable with his presence, and he left the premises.[2]  Margaret Wildgrube complained

about this incident to Bob Morrow later that night.  Hasford returned to MIMICS on January 16,

1997 and again, without a warrant and without obtaining consent, entered the office through a

different door.  This time, Plaintiff Richard Wildgrube discovered him on the premises.  After

Hasford stated that he could obtain a warrant to search the office, Richard Wildgrube asked him

to leave.[3]

　　In early January 1997, Margaret Wildgrube complained to the Mayor about Defendant

Hasford's actions as well as about an alleged conflict of interest posed by Hasford's simultaneous

possession of a contractor's license and service as building inspector.[4]  Margaret Wildgrube also

---

[2]The parties disagree over Hasford's reasons for entering, whether the door by which he entered was unlocked, the details of the Hasford and Margaret Wildgrube's conversation, and whether Margaret Wildgrube allowed him to leave by a different door than the one he used to enter.

[3]The parties disagree as to the reason for this visit and the nature of Hasford and Richard Wildgrube's conversation.

[4]New Mexico Construction and Industry Regulations provide that
Any person employed or placed under contract by the division or by any county or municipality for the purpose of carrying out the provisions of the Construction Industries Licensing Act who holds any contractor's license or certificate of competence issued by the division, shall, as a condition of employment surrender the contractor's license or certificate of competence to the division to be held in inactive status.

contends that she spoke with a reporter from the local newspaper about these incidents and that a story on this matter ran in the Sangre de Cristo Chronicle on January 16, 1997. Additionally, Plaintiffs Richard and Margaret Wildgrube complained about Hasford's conduct during several Village Council and P&Z Commission meetings, starting on January 23, 1997.

Plaintiffs further allege that a January 17, 1997 inspection by the New Mexico Construction and Industries Division (NM CID) was part of the individual Defendants' efforts to target Plaintiffs. During that inspection, NM CID Bureau Chief Fermin Aragon and State Building Inspector Ruben Lopez were accompanied by Hasford, Angel Fire's Mayor, P&Z Commission Chair Linda Libbey, and Morrow. Plaintiffs state that after the inspection, the NM CID officials orally indicated that the MIMICS office space presented some minor, but no major building code violations, and that there was no problem with having MIMICS occupy the RCC space.[5]

On February 13, 1997, the P&Z Commission formally voted to permit MIMICS to remain at RCC for six months, while the Commission determined whether the occupancy violated the Village Zoning Ordinance. On February 20, 1997, the Village Council concluded that the Commission actually did not have authority to allow MIMICS to remain in an R-3 area. The matter was then sent back to the Commission. On March 27, 1997, Village Attorney Bill Erwin advised P&Z that MIMICS was in violation of Angel Fire's Zoning Ordinance. In September 1997, Plaintiffs were ordered to cease and desist from engaging in commercial or business activity

_____

NMSA 1978, § 60-13-8 (repeal effective July 1, 2006).

[5]On February 11, 1997, NM CID issued an inspection report concluding that commercial use of the RCC space, as is, would violate three provisions of the Uniform Building Code, but that residential use of the same space would not trigger these regulations.

in a building zoned R-3.  Plaintiffs claim that, as a result of this order, they moved MIMICS to
another location.

On July 29, 1999, Plaintiffs filed suit under 42 U.S.C. § 1983, alleging that Defendants
had violated their First Amendment rights by retaliating against them and had violated their
substantive and procedural due process rights in raising the cease and desist order without notice
to Plaintiffs.  Plaintiffs also alleged that Defendants violated the New Mexico Tort Claims Act.

Defendants moved for summary judgment, and Plaintiffs requested leave to file an
amended complaint.  The Court granted Defendants' motions as to Plaintiffs' substantive due
process and state tort claims, but denied the motions as to the remaining claims.  The Court
granted Plaintiffs leave to submit an amended complaint, which was filed on April 27, 2001.  In
the First Amended Complaint **[Doc. No. 116]**, Plaintiffs seek money damages pursuant to 42
U.S.C. §§ 1983 and 1988 for Defendants' alleged violations of Plaintiffs' First Amendment rights
of free speech and free association, Fourth Amendment right to be free from unlawful searches,
and Fourteenth Amendment guarantees of equal protection and procedural due process.
Defendant Hasford filed a partial motion to dismiss the amended complaint on May 11, 2001
**[Doc. No. 118 & 119]**.  On August 2, 2001, Defendants Village of Angel Fire, McKinley and
Stansbury filed a motion requesting summary judgment on all Plaintiffs' claims **[Doc. No. 130 &
131]**.  On November 11, 2001, Plaintiffs filed a motion seeking summary judgment on all Fourth
Amendment claims against the Village and Defendant Hasford **[Doc. No. 190 & 192]**.  On
November 15, 2001, Defendant Hasford filed a motion for summary judgment claiming qualified
immunity against all claims brought against him **[Doc. No. 194 & 195]**.

The Court will address all outstanding motions herein.

## STANDARD

Summary judgment is an integral part of the Federal Rules of Civil Procedure, which are intended to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting FED. R. CIV. P. 1). Under Rule 56(c), summary judgment is appropriate when the court, viewing the record in the light most favorable to the nonmoving party, determines that "there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." *Thrasher v. B & B Chem. Co.*, 2 F.3d 995, 996 (10th Cir. 1993).

The movant bears the initial burden of showing "there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). Once the movant meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting FED. R. CIV. P. 56(e)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

Although the material submitted by the parties in support of and in opposition to the motion must be construed liberally in favor of the party opposing the motion, *Pittsburg & Midway Coal Min. Co. v. Yazzie*, 909 F.2d 1387, 1427 (10th Cir. 1990), the burden on the moving party may be discharged by demonstrating to the court that there is an absence of evidence to support the nonmoving party's case, *Celotex*, 477 U.S. at 325. In such a situation, the moving party is

entitled to judgment as a matter of law "because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 322.

## DISCUSSION

**I.** **Qualified Immunity Motion**

Defendant Hasford seeks summary judgment on grounds of qualified immunity. Qualified immunity is an affirmative defense to actions brought under 42 U.S.C. § 1983 and shields public officials from "trial or ... other burdens of litigation." *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985). In other words, the doctrine provides "immunity from suit rather than a mere defense to liability." *Saucier v. Katz*, 533 U.S. 194, 200 (2001).

Unlike the typical summary judgment analysis, once a defendant raises a qualified immunity defense, the burden shifts to the plaintiff, who must demonstrate first that the defendant's acts violated a constitutional or statutory right and second that the constitutional or statutory right at issue was clearly established at the time of defendant's conduct. *Verdecia v. Adams*, 327 F.3d 1171, 1174 (10th Cir. 2003). The Court must conduct this two-pronged analysis in precisely this sequence. *Saucier*, 533 U.S. at 200. If the plaintiff cannot make either of these showings, the Court must grant defendant's motion for summary judgment. *Id.* However, if plaintiff satisfies this two-prong test, "defendant then bear[s] the traditional burden of the movant for summary judgment – showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Nelson v.McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000) (quotations and citation omitted).

Accordingly, the Court first must inquire whether Plaintiffs' allegations, read in the light

most favorable to them, establish that Defendant Hasford's actions violated a constitutional or statutory right. *Saucier*, 533 U.S. at 201. Only if the Plaintiffs meet this requirement will the Court examine whether the constitutional or statutory rights were "clearly established" when Hasford's actions took place.

> For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see *Mitchell* [v. *Forsyth,* 472 U.S. 511, 535 n.12] but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton,* [483 U.S. 635, 640 (1987)].

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Expounding further on this idea, the Tenth Circuit has stated that, in the absence of Supreme Court or Tenth Circuit authority clearly on point, a right still is said to have been defined adequately for qualified immunity purposes "if the clearly established weight of authority from other courts shows that the right must be as plaintiff maintains." *Roska ex rel Roska v. Peterson*, 328 F.3d 1230, 1248 (10th Cir. 2003) (citation omitted). Although cases involving either "fundamentally similar" or "materially similar" facts "can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Hope*, 536 U.S. at 741.

"Once the district court determines that the right at issue was 'clearly established,' it becomes defendant's burden to prove that her conduct was nonetheless objectively reasonable." *Roska ex rel Roska*, 328 F.3d at 1251 (citing *Cannon v. City & Count of Denver*, 998 F.2d 867, 874 (10th Cir. 1993)). The reason for this additional inquiry is to ensure that the unlawfulness of the defendant's conduct was apparent under existing law, since qualified immunity is "intended to provide government officials with the ability 'reasonably [to] anticipate when their conduct may

give rise to liability for damages.'" *Anderson v. Creighton*, 483 U.S. 635, 646 (1987) (alteration

in original) (quoting *Davis v. Scherer*, 468 U.S. 183, 195 (1984)).  As a result, even though

conduct may have been unlawful under the clear dictates of the law at the time, the doctrine of

qualified immunity takes into account the fact that reasonable officers may make reasonable

mistakes as to whether their conduct comported with those principles.  *See, e.g., Creighton*, 483

U.S. at 641 ("it is inevitable that law enforcement officials will in some cases reasonably but

mistakenly conclude that probable cause is present, and ... in such cases those officials – like other

officials who act in ways they reasonably believe to be lawful – should not be held personally

liable").  Accordingly, "where 'officers of reasonable competence could disagree on th[e] issue,

immunity should be recognized." *Roska ex rel Roska*, 328 F.3d at 1251 (alteration in original)

(quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)).

Plaintiffs claim that Hasford violated their First Amendment rights of free speech and free

association, their rights to equal protection, and their rights to be free from unreasonable searches.

The Court will address each of these claims within the framework of the qualified immunity

analysis.

## A.  First Amendment claims

As for their free speech claim, Plaintiffs state that Hasford retaliated against them for

having spoken out against Hasford's "Gestapo type tactics" and against his simultaneous

possession of a general contractors' license and position as the Village building inspector, in

violation of New Mexico Construction and Industry Regulations, NMSA 1978, § 60-13-8 (repeal

effective July 1, 2006).  (First Amended Complaint at ¶53.)  As for their free association claim,

Plaintiffs believe Hasford allegedly harassed them because of their "political, social and business

association" with then-Village Councilmember Bob Morrow.  (First Amended Complaint at ¶52.)

Although Plaintiffs do not clearly indicate what particular acts described in the First Amended

Complaint constitute the harassment, the Court will consider the following alleged conduct as the

purported retaliation:  two "clandestine" entries into the MIMICS offices by Hasford in December

1996 and January 1997; a "secret meeting" between NM CID officials and Defendants Stansbury,

McKinley, and Hasford in early February 1997, even though Hasford was no longer the Village

building inspector[6]; and a written statement made by Hasford after MIMICS had vacated the RCC

space in September 1997 and while he had begun to serve as a Village Councilmember that

Plaintiff Richard Wildgrube "appeared to be irrational and might inflict bodily harm upon others."

### 1.  Whether Plaintiffs' allegations establish that Hasford violated their First Amendment rights

In *Worrell v. Henry*, 219 F.3d 1197 (10th Cir. 2000), the Tenth Circuit laid out the

relevant legal analysis for a claim alleging retaliatory conduct by a "defendant who is not the

plaintiff's employer and when there is no contractual relationship between them."  *Id.* at 1212.

On such facts, the court stated that proof of the following three elements was required:

> (1) that the plaintiff "was engaged in constitutionally protected activity"; (2) that the defendant's actions caused the plaintiff "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) that the "defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct."

---

[6]Suits brought under 42 U.S.C. § 1983 only may challenge conduct by a state actor. Plaintiffs, in their Response to Defendant Hasford's Motion for Summary Judgment, attempt to meet this requirement with regard to Hasford's actions after his resignation as building inspector and before his service as Village Councilmember by alleging the existence of a conspiracy between him and the other named Defendants.  (Pls.' Resp. to Hasford's Summ. J. Mot. [Doc. No. 202] at 15.)

*Id.* (quoting *Lackey v. County of Bernalillo*, No. 97-2265, 1999 WL 2461, at *3 (10th Cir. Jan. 5, 1999)); *see also Nat'l Commodity & Barter Ass'n v. Archer*, 31 F.3d 1521, 1531 n.4 (10th Cir. 1994).

Defendant Hasford argues (a) that Plaintiffs were not engaged in any constitutionally protected activity while he was still serving as the Village Building inspector, (b) assuming they did engage in First Amendment speech and/or association, that Plaintiffs suffered no injury sufficient to "chill" an ordinary person from engaging in such conduct, and (c) that Plaintiffs have no evidence his actions were "substantially motivated" by their conduct.

To determine whether, under the first prong of the qualified immunity analysis, Plaintiffs have alleged a violation of their constitutional rights to free speech or association, the Court must examine whether Plaintiffs' allegations support a claim under the three-part test of *Worrell*. If Plaintiffs' allegations meet the standards of *Worrell*, the Court will then turn to the second prong of the qualified immunity analysis.

### a.  Whether Plaintiffs engaged in constitutionally protected activity

Hasford claims that Plaintiffs' first public complaints about him were not made until January 23, 1997, "after Hasford had already resigned his position," and that Plaintiffs have no evidence of having engaged in any constitutionally protected speech before that date.[7]  This allegation is plainly inconsistent with the evidence before the Court.

_____

[7]As a preliminary matter, the Court notes that Plaintiffs' claim of retaliation is grounded equally in their alleged association with Morrow.  Thus, even if the Court were to agree that Plaintiffs had not engaged in any protected speech before Hasford's resignation, Plaintiffs still could maintain their First Amendment claim on the grounds that Hasford's conduct as building inspector vis a vis Plaintiffs was in response to their association – assuming, of course, the association comes within the ambit of First Amendment guarantees.

Hasford resignation as the Village building inspector went into effect on January 23, 1997. (Sangre de Cristo Chronicle article, Exhibit 4 to [Doc. No. 203]; Bob Morrow Decl. dated 12/2/01, Exhibit 2 to [Doc. No. 203] at ¶15.)  Plaintiff Margaret Wildgrube stated that she first complained about Defendant Hasford's "rude and invasive tactics" to Councilor Morrow on December 20, 1996, after Hasford's first entry onto MIMICS property.  (Margaret Wildgrube Decl. dated 2/15/01, Exhibit 1 to [Doc. No. 105] at ¶3.)  Plaintiffs Margaret and Richard Wildgrube also complained of Defendant Hasford's actions to NM CID Bureau Chief Fermin Aragon and State Inspector Ruben Lopez during their January 17, 1997 inspection of the MIMICS offices.  (Margaret Wildgrube Decl. dated 2/15/01, Exhibit 1 to [Doc. No. 105] at ¶14.) According to the statement of Linda Libbey, upon hearing of Defendant Hasford's entries onto the MIMICS premises, "[t]he CID officials confirmed that a building inspector should not conduct himself that way."  (Linda Libbey Decl. dated 2/14/01, Exhibit 3 to [Doc. No. 105] at ¶17.)  The record further reflects that Plaintiff Margaret Wildgrube voiced her concerns about Defendant Hasford's suspected violation of NMSA 1978, § 60-13-8 to Marcia Wood, a writer for the Sangre de Cristo Chronicle (Response to Hasford's RFA No.8 and Interrogatory No.1, Exhibits 1 and 2 to [Doc. No. 179]), and that one story was published about the matter on January 16 (Margaret Wildgrube Decl. dated 2/15/01, Exhibit 1 to [Doc. No. 105] at ¶13).  Thus, to the extent that Hasford's motion for summary judgment hinges on his assertion that Plaintiffs have no proof that they made complaints before Hasford resigned, the Court finds the motion is contradicted by the evidence.

Moreover, the Court is not convinced that the assumption implicit in Defendant Hasford's focus on the timing of Plaintiffs' complaints -- namely, that any complaints about his conduct

made after his resignation were not constitutionally protected -- is accurate.  At the very least, the record reflects that the Village Council was considering appointing Defendant Hasford to the committee that was to select a new building inspector.  Under the relevant legal definition of "public concern," *see discussion infra*, it seems clear that claims of unethical or improper conduct by Defendant Hasford while he had been building inspector would be of import to the public and to the Councilmembers as they decide whether to include him in the process to select his replacement.  In other words, if the statements made by Plaintiffs *after* Defendant Hasford's resignation but before or while he was selected by the Village Council to help find a new building inspector, are in fact of "public concern," then they remain relevant to a consideration of Plaintiffs' free speech retaliation claim.

### i. Whether Plaintiffs' speech was of "public concern"

To determine whether Plaintiffs' speech is constitutionally protected, the Court must look to the totality of the "content, form, and context" of their statements and ask whether "it can 'be fairly considered as relating to any matter of political, social, or other concern to the community.'"  *Belcher v. City of McAlester*, 324 F.3d 1203, 1207 (10th Cir. 2003) (quoting *Connick v. Myers*, 461 U.S. 138, 146, 147-48 (1983)).  That the topic of the speech might be of "general interest to the public" is insufficient.  *Id.* (quoting *Schalk v. Gallemore*, 906 F.2d 491, 495 (10th Cir. 1990)).  "[W]hat is *actually said* must meet the public concern threshold."  *Id.* (quoting *Schalk*, 906 F.2d at 495 (alteration in original)).  When examining the content of the speech, a court must consider whether it "sufficiently inform[s] the issue as to be helpful to the public in evaluating the conduct of the government."  *Lee v. Nicholl*, 197 F.3d 1291, 1295 (10th Cir. 1999) (quotations and citation omitted).

-14-

"Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials, in terms of content, clearly concerns matters of public import." *Conaway v. Smith*, 853 F.2d 789, 796 (10th Cir. 1988) (citations omitted). In distinguishing between speech that relates to such matters of public concern from speech that simply airs personal grievances against public officials, courts have looked to the speaker's motives to determine whether the speech carried some "broader public purpose." *Gardetto v. Mason*, 100 F.3d 803, 812 (10th Cir. 1996) (citing *Conaway*, 853 F.2d at 796). Stated otherwise, a court "must evaluate whether [the plaintiffs] spoke out based on the same motivation that would move the public to speak out." *Id.* The fact that the speech may have been expressed in a private forum does not mean that it is without constitutional protection. *Nicholl*, 197 F.3d at 1295.

Considering the content and the context of the speech at issue here, the Court concludes that it is of public concern. As to content, Plaintiffs' comments - both before and after Hasford submitted his letter of resignation - describe allegedly improper conduct by Defendant Hasford in his capacity as the Village building inspector. That Plaintiffs may have used colorful language in characterizing his acts as "Gestapo like" does not automatically reduce their speech to "personal" grievances. Moreover, even if Plaintiffs' speech was intended to address the specific problem of how Defendant Hasford had interacted with them, because it ultimately addressed his conduct in discharging his duties as building inspector, it remains within the bounds of constitutionally protected speech. "[S]peech which touches on matters of public concern does not lose protection merely because some personal concerns are included." *Hulen v. Yates*, 322 F.3d 1229, 1238 (10th Cir. 2003) (citing *Connick*, 461 U.S. at 149). While they may dispute the veracity of the speech at issue here, Defendants and Plaintiffs agree that the commentary consisted of complaints,

-15-

in one form or another, about Defendant Hasford's "rude behavior" and his allegedly "inappropriate entries" into the MIMICS offices and his violation of NMSA 1978, § 60-13-8. The possible or actual misconduct of and regulatory violation by a municipal employee are certainly matters of public concern.

The context in which Plaintiffs' speech took place gives the Court additional grounds for finding that the speech was motivated by public concerns that reach beyond any personal misgivings with Defendant Hasford. Plaintiffs voiced their concerns to Bob Morrow, who was both their landlord and an at-large Village Councilmember. Additionally, Plaintiffs complained of Hasford's disruptive conduct to investigators from the NM CID (Margaret Wildgrube Decl. dated 2/15/01, Exhibit 1 to [Doc. No. 105] at ¶14; Linda Libbey Decl. dated 2/14/01, Exhibit 3 to [Doc. No. 105] at ¶16), to Mayor Cottam (Richard Wildgrube Decl. dated 10/24/01, Exhibit 5 to [Doc. No. 105] at ¶11-12; Margaret Wildgrube Decl. dated 2/15/01, Exhibit 1 to [Doc. No. 105] at ¶11), and to the P&Z Commission (P&Z Commission Mins. of 1/30/97, Exhibit H to [Doc. No. 131]). In part, Plaintiffs complained about Hasford's conflict of interest in holding an active contractor's license while serving as a building inspector to Councilmember Morrow (Margaret Wildgrube Decl. dated 2/15/01, Exhibit 1 to [Doc. No. 105] at ¶10), to Mayor Cottam (Margaret Wildgrube Decl. dated 2/15/01, Exhibit 1 to [Doc. No. 105] at ¶11), and to the Village Council (Village Council Meeting Mins. of 2/20/97, Exhibit J to [Doc. No. 131]). Accordingly, the Court finds that Plaintiffs did engage in speech that is constitutionally protected.

### ii. Whether Plaintiffs' relationship with Morrow was constitutionally protected association

Hasford fares no better in his argument that Plaintiffs had not engaged in any constitutionally protected form of association.  The Supreme Court has stated that "the nature and degree of constitutional protection afforded freedom of association may vary depending on the extent to which ... the constitutionally protected liberty" in question can be characterized as either freedom of intimate association or freedom of expressive association.  *Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984).  In delineating the contours of constitutionally protected expressive association, the Court has explained that "implicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."  *Id.* at 622 (citations omitted).

Hasford claims that, at most, Plaintiffs have pled the existence of a business relationship and casual friendship with Morrow and that these relationships are not covered by the First Amendment.  The Court agrees that, to the extent Plaintiffs' claim for retaliation is based on their "social and business association"  with Morrow, Plaintiffs have failed to assert an actionable claim.  Although the Tenth Circuit has noted that the "right to associate protects an individual's decision to enter into and maintain certain intimate human relationships," the court has made clear that such constitutionally protected "intimate relationships" have been found to exist only in cases involving *familial* relationships.  *Copp v. Unified Sch. Dist. #501*, 882 F.2d 1547, 1551 (10th Cir. 1989).  While the Supreme Court has left open the possibility that a social relationship or friendship might come within First Amendment protection, *see, e.g., United States Jaycees*, 468

U.S. at 620 (noting existence of "broad range of human relationships that may make greater or lesser claims to constitutional protection from particular incursions by the State" but refusing to "mark the potentially significant points on this terrain with any precision"), this Court does not find that the casual, social relationship alleged to have existed between Plaintiffs and Morrow rises to the level of intimacy protected by the First Amendment.

On the other hand, the Court does find that Plaintiffs have alleged sufficient facts to support a claim for retaliation based on their political association with Morrow. There is no doubt that "[t]he First Amendment protects political association as well as political expression." *Buckley v. Valeo*, 424 U.S. 1, 16 (1976). Indeed, "political belief and association constitute the core of those activities protected by the First Amendment," *Elrod v. Burns*, 427 U.S. 347, 356 (1976), and support for a particular political party, candidate or platform is among the activities understood to be constitutionally protected political association.

Although evidence adduced at trial may support Defendants' contention that Plaintiffs in fact were not affiliated politically with Morrow, the Court must take Plaintiffs' allegations to be true on the current motion. Viewing the record in such a light, the Court finds that Plaintiffs have presented enough evidence to support a conclusion that their relationship with Morrow was a political association. Plaintiffs have stated that they complained to Morrow about Defendant Hasford's conduct in December 1996 at least in part because Morrow was one of their local representatives, as an elected member of the Village Council (Margaret Wildgrube Decl. dated 2/15/01, Exhibit 1 to [Doc. No. 105] at ¶3). Furthermore, Plaintiffs allege they were allied politically with Morrow well before he ran for a Council seat -- as early as 1995 (First Amended Complaint at ¶8) and that they supported him from that time "in his political viewpoints as a

Planning and Zoning Committee Member and as a our [sic] councilor" (Margaret Wildgrube Decl. dated 2/15/01, Exhibit 1 to [Doc. No. 105] at ¶2; *see also* Linda Libbey Decl. dated 2/14/01, Exhibit 3 to [Doc. No. 105] at ¶12).

Hasford points out that Morrow himself has stated that he did not commence his electoral campaign for a Village Council position until late 1997 or early January 1998 and that, since he had "no political aspirations" before then, he did not see how anyone such as the Wildgrubes could have been considered his political supporters.  (Bob Morrow Dep. of 1/2/01, Exhibit B to [Doc. No. 194] at 128.)  However, it is undisputed that Morrow was serving as an appointed Village Councilmember as of October 1996.  Constitutionally protected political association is not so narrowly defined as to be limited to campaign work or electoral support.  *See, e.g., Elrod v. Burns*, 427 U.S. at 357 ("There can no longer be any doubt that freedom to associate with others for the common advancement of political beliefs and ideas is a form of 'orderly group activity' protected by the First and Fourteenth Amendments," quoting *Kusper v. Pontikes*, 414 U.S. 51, 56-57 (1973)).  Although Plaintiffs could not have supported Morrow in an electoral campaign prior to January 1997 because no such campaign existed, Plaintiffs' political association with Morrow could have related to his position as an appointed Councilmember or, even earlier, to his work as an appointed member of the Village's Planning and Zoning Commission.  *Accord Bass v. Richards*, 308 F.3d 1081, 1091 (10th Cir. 2002) (plaintiff successfully alleged claim for retaliation in violation of his rights to political association because "there is no meaningful distinction for First Amendment purposes between nonpartisan political alignment and membership in a political party").

Thus, the Court concludes that Plaintiffs have met the first part of the *Worrell* test for alleging a violation of First Amendment rights as a result of retaliatory conduct.

**b.  Whether Plaintiffs suffered an injury sufficient to "chill" an ordinary person from engaging in their speech or association**

Hasford argues that Plaintiffs have not shown that his conduct "caused them **any** injury, much less injury that would 'chill' plaintiffs' [sic] from engaging in protected activity."  If anything, Hasford continues, any investigation that may have resulted from Hasford's conduct "may have adversely impacted **Morrow** but did not injury the plaintiffs."  (Def. Hasford's Mem. in Supp. of Summ. J. [Doc. No. 195] at 11.)  However, the question is not whether these particular individuals were "chilled" in their activity, but whether a "person of ordinary firmness" would be so inhibited.  *See, e.g., Smith v. Plati*, 258 F.3d 1167, 1177 (10th Cir. 2001).  That is, the standard is not a subjective one.

Reading the record in the light most favorable to Plaintiffs, the Court concludes that Hasford's entries into the MIMICS offices would cause a person of ordinary firmness to cease any public criticism of his activities or to discontinue political support for Morrow, a local official known to be at odds with Hasford.

The Court also believes that the February 1997 "secret meeting" between NM CID officials and Defendants Stansbury, McKinley and Hasford could have the effect of preventing an ordinary person from speaking critically of Hasford or from associating with Morrow.  Assuming an ordinary person were to find out that her own or her rented property was the subject of a discussion between, among others, the town's only building inspector and a state authority charged with enforcing building and construction codes, that individual might very well

discontinue her criticism of the building inspector or her support for a particular political opponent.

However, the Court does not believe that Hasford's less than flattering description of Richard Wildgrube would chill a person of ordinary firmness from either speaking critically of Hasford or taking up political positions in opposition to him.  While Hasford's statements may have been insulting or false, the Court does not believe they were so severe or threatening as to silence an average individual who disagreed with Hasford's views on other matters.

To summarize, to the extent Plaintiffs' claim for retaliation is based on Hasford's entries into the MIMCS offices and his participation in the February 1997 meeting with NM CID, Plaintiffs' claim meets the requisites of *Worrell*'s second prong.  However, to the degree that Plaintiffs are arguing that Hasford's written comments concerning Richard Wildgrube constituted retaliatory action that violated their First Amendment rights, the Court finds such a theory to be legally insufficient.

**c.  Whether Hasford's actions were "substantially motivated" by Plaintiffs' speech or association**

The third part of the *Worrell* test involves an examination of Defendant Hasford's intent in entering the MIMICS offices and in participating in the February 1997 meeting with NM CID. Cognizant of the difficulty inherent in proving a person's state of mind, courts have held that proof of retaliatory intent may take the form of either direct or circumstantial evidence.  *See, e.g., Poole v. County of Otero*, 271 F.3d 955, 962 (10th Cir. 2001) (timing of defendant's conduct may be considered as circumstantial evidence of retaliatory intent); *Bloch v. Ribar*, 156 F.3d 673, 682 (6th Cir. 1998) ("proof of an official's retaliatory intent rarely will be supported by direct

evidence of such intent") (quoted in *Poole*, 271 F.3d at 962); *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1300-01 (9th Cir. 1991) ("Intent to inhibit speech ... can be demonstrated either through direct or circumstantial evidence.").  In addition, the Tenth Circuit has outlined a distinct method for evaluating intent in the context of a summary judgment motion that raises a qualified immunity defense.  First, the defendant must make "a prima facie showing of the objective reasonableness of the challenged conduct."  *Seeds v. Lucero*, 177 F.Supp.2d 1261, 1270 (D.N.M. 2001) (quoting *Gehl Group v. Koby*, 63 F.3d 1528, 1535 (10th Cir. 1995), *overruling on other grounds recognized by Patel v. Wooten*, No. 00-1187, 2001 WL 788639 (10th Cir. July 12, 2001)).  If the defendant succeeds in making such a showing, the Court then must determine whether plaintiffs have met their burden in establishing that the defendant "acted on the basis of a culpable subjective state of mind."  *Id.* (quoting *Gehl Group*, 63 F.3d at 1535). Such an approach acknowledges that, "[a]n act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper."  *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990) (quotations and citation omitted).

At this point, the challenged conduct that may form the basis of Plaintiffs' retaliation claims are Hasford's December 1996 and January 1997 entries into the MIMICS offices and his February 1997 "secret meeting" with NM CID officials, Defendant Stansbury and Defendant McKinley.  The Court will examine the latter act of alleged retaliation first and determine whether Plaintiffs have presented sufficient evidence of "substantial motivation" to survive a qualified immunity summary judgment motion.

### i.  Has Hasford made a prima facie showing that his conduct was "objectively reasonable"?

Hasford argues that his February 1997 meeting with NM CID was motivated by a desire to present his concerns about Morrow's unlicensed and nonpermitted construction activity.  The Court finds that this is an objectively reasonable explanation for the meeting.  The possibility that the discussion was conducted in "secret" and the fact that Hasford was no longer serving as building inspector does not make Hasford's explanation any less reasonable.  Since he was the Village building inspector for a period of time when projects undertaken by Morrow had come under inquiry, it would be objectively understandable to have him in attendance at a meeting between other Councilmembers and NM CID.

As for his December 1996 and January 1997 conduct, Hasford argues that his two warrantless, nonconsensual entries into the MIMICS offices were justified by his reasonable suspicions of unlicensed and nonpermitted construction in the MIMICS offices.  The Court notes that Hasford has stated that, as for the December entry, his suspicion was aroused by a newly constructed deck and stairs, along with building materials he observed outside the RCC building, near the door that led to the MIMICS offices.  (Charles Hasford Depo. dated 11/18/01, Exhibit 11 to [Doc. No. 203] at 58, 172-73.)  Before entering MIMICS, he examined the deck and concluded that a permit would not have been required for its construction.  (Charles Hasford Depo. dated 11/18/01, Exhibit 11 to [Doc. No. 203] at 172-73.)  In other words, Hasford's claim of "reasonable suspicion" of nonpermitted work is contradicted by his own testimony as to his observations on the evening of the first entry.

Moreover, "reasonable suspicion" of violations of regulatory laws cannot support a warrantless entry into commercial premises, absent consent.  In *See v. City of Seattle*, 387 U.S. 541 (1967), the Supreme Court concluded that "administrative entry, without consent, upon the portions of commercial premises which are not open to the public may only be compelled through prosecution or physical force within the framework of a warrant procedure."  *Id.* at 545 (footnote omitted).  To the extent that Defendant Hasford claims his entries were reasonable because the law does not require a warrant for administrative searches of commercial premises unless and until the proprietors refuse consent to the search, Hasford's legal assumption is inaccurate.[8]

In the present case, Defendant concedes that he was acting as the Village building inspector when he made the entries described in Plaintiffs' complaint.  (Charles Hasford Depo. dated 11/8/01, Exhibit A to [Doc. No. 201] at 189).  Even though Hasford disputes whether his entry was in fact a "search," *see discussion infra,* he admits that he was acting in his official capacity as building inspector.  As such, his authority for entering into the MIMICS offices stems from Village Ordinance 1990-3, which states:

> The building or construction of any new building and structures within the municipal boundaries of the Village of Angel Fire, including new construction, additions, alterations or repairs, shall comply with all the requirement of the Uniform Building Code ... and with the New Mexico Building Code....  It shall be the duty of the Building Inspector to examine all applications for building permits and to inspect at such intervals as he or she deems appropriate, all ongoing construction within the Village of Angel Fire in order to ascertain compliance with the building codes and all other applicable ordinances and laws.  For this purpose, the Building Inspector shall have the power to seek inspection of any property or structure at reasonable hours to determine compliance.

VILLAGE OF ANGEL FIRE, N.M., ORDINANCE NO. 1990-03 (adopted Sept. 6, 1990).

_____

[8]For a detailed explanation of the law concerning warrants and administrative searches of commercial premises, see discussion in Section III.A.3., *infra*.

Although one of the factors to consider in evaluating the objective reasonableness of an official's conduct is whether the defendant relied on a "statute, regulation, or official policy that explicitly sanctioned the conduct in question," *Roska ex rel Roska v. Peterson*, 328 F.3d 1230, 1251 (10th Cir. 2003) (citations omitted), reliance on such authority "does not render the conduct per se reasonable," *id.* at 1252, and only "militates in favor of the conclusion that a reasonable official would find that conduct constitutional," *id.* (quoting *Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994)).  Indeed, reliance on a statute "authoriz[ing] official conduct which is patently violative of fundamental constitutional principles" cannot make the defendant's conduct "objectively reasonable."  *See, e.g., Roska ex rel Roska*, 328 F.3d at 1252 n.30 (quoting *Grossman*, 33 F.3d at 1209).

While the Supreme Court has acknowledged that "legislative schemes authorizing warrantless administrative searches of commercial property do not necessarily violate the Fourth Amendment," *Donovan v. Dewey*, 452 U.S. 594, 598 (1981) (citations omitted), the Court also has identified when such legislative schemes are undoubtedly unconstitutional:

> [W]arrantless inspections of commercial property may be constitutionally objectionable if their occurrence is so random, infrequent, or unpredictable that the owner, for all practical purposes, has no real expectation that his property will from time to time be inspected by government officials.  Where Congress has authorized inspection but made no rules governing the procedures that inspectors must follow, the Fourth Amendment and its various restrictive rules apply.  In such cases, a warrant may be necessary to protect the owner from the unbridled discretion [of] executive and administrative officers, by assuring him that reasonable legislative or administrative standards for conducting an ... inspection are satisfied with respect to a particular [establishment].

*Dewey*, 452 U.S. at 599 (quotations and citations omitted).

Furthermore, the Tenth Circuit has read Supreme Court precedent as standing for the principle that, "[a]dministrative searches conducted pursuant to statues of general applicability

-25-

require search warrants." *V-1 Oil Co. v. Wyo. Dep't of Envtl. Quality*, 902 F.2d 1482, 1487 (10th

Cir. 1990), *cert. denied sub nom. V-1 Oil Co. v. Gerber*, 498 U.S. 920 (1990) (citing inter alia

*Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313-14 (1978); *See,* 387 U.S. at 546).  The ordinance

that authorized Defendant Hasford's conduct in this instance is precisely such a law.  It is a

generally applicable law that, in the words of *Dewey*, lists no procedures, let alone any reasonable

standards, to guide a building inspector's conduct and therefore provides no protection against

the exercise of "unbridled discretion."

    If anything, Hasford's inconsistent and confusing statements as to his reasons for entering

the building illustrate the problems both the Supreme Court and the Tenth Circuit had in mind

when confronted with such statutory provisions.  Hasford's deposition testimony is rife with

contradictory statements on this issue.  At one point, when asked whether he considered the

December 1996 visit to the MIMICS offices an "inspection," Hasford stated that he did not

consider it an inspection at the time, that "[t]he reason I went in there was to see what was going

on actually."  (Charles Hasford Depo. dated 4/6/00, Exhibit 3 to [Doc. No. 193] at 53.)

However, a few minutes later, when asked whether he considered "that visit to the premises an

inspection," Hasford unequivocally replied, "Yes."  (Charles Hasford Depo. dated 4/6/00, Exhibit

3 to [Doc. No. 193] at 57.)  While "Hasford does not dispute that he entered MIMICS to inspect

for potential building code violations" (Def. Hasford's Resp. to Pls.' Summ. J. Mot. [Doc. No.

201] at 9) and his counsel has stipulated that Hasford was acting as the Angel Fire building

inspector during the events in question (Charles Hasford Depo. dated 11/8/01, Exhibit A to [Doc.

No. 201] at 189), Hasford asserts a distinction between such a search and a search that would be

covered by the Fourth Amendment.  Thus, in light of the Supreme Court's statement in *Dewey*

and the concerns enunciated in related cases, this Court does not believe that any reliance by Hasford on Village Ordinance 1990-3 can make his conduct objectively defensible because the ordinance is plainly unconstitutional.[9]

In light of the ample caselaw on this issue, the Court finds that Defendant Hasford has not made a prima facie showing that his entries into the MIMICS offices were objectively reasonable. His own statements as to his purpose in entering the premises are contradictory, and his belief as to what the law allowed him to do is gravely misinformed. As Hasford has failed to meet his burden of showing his entries were objectively reasonable, Plaintiffs need not show evidence of his state of mind. Thus, insofar as Plaintiffs' First Amendment retaliation claim is based on Defendant Hasford's entries into the MIMICS offices, Plaintiffs have met the *Worrell* test for stating an actionable claim.

### ii.  Have Plaintiffs presented evidence of Hasford's "culpable state of mind"?

Returning to the February 1997 meeting involving Defendants Hasford, Stansbury, McKinley and NM CID, because Defendant has presented an objectively reasonable explanation for his participation in that meeting, the Plaintiffs must cite to particular evidence that Hasford

---

[9]In addition to the authority cited above indicating that the nonconsensual, warrantless entries would be unconstitutional on the facts presented, the Tenth Circuit has suggested that conduct like Hasford's, as well as the ordinance purportedly authorizing such conduct are of questionable legality, in a case involving a nearly identical ordinance. In a footnote in *Artes-Roy v. City of Aspen*, 31 F.3d 958 (10th Cir. 1994), the court observed that the relevant Aspen ordinance stated, "Upon presentation of his credentials, the chief building inspector, or his duly authorized representative, may enter at any reasonable time any building, structure or premises in the city to perform any duty imposed upon him by this Code." *Id.* at 963, n.6. The court cautioned that, "[i]f the City is interpreting this ordinance to permit nonconsensual entries without a warrant for building code inspections ... a case might be made for liability on the part of the City if entry is made to inspect for violations or to arrest." *Id.* The Aspen ordinance is functionally identical to Village Ordinance 1990-3.

acted with a culpable subjective state of mind in order to meet the third prong of *Worrell*.  *See, e.g., Bruning v. Pixler*, 949 F.2d 352, 357 (10th Cir. 1991) ("If the defendant makes this prima facie showing, the plaintiff must then produce *specific evidence* of the defendant's culpable state of mind to survive summary judgment.") (emphasis added).  Plaintiffs have not pointed to any such evidence.  While it is true that they have presented evidence indicating a political divide existed between Village Councilmembers and Hasford's allegiances were in competition with their own, they have not pointed to any "specific evidence" of any illicit motives for Hasford's participation in the meeting, that would meet Hasford's reasonable explanation for having attended.

### 2.  Were Plaintiffs' First Amendment rights "clearly established" at the time of Hasford's conduct?

Since Plaintiffs have shown that their constitutional rights to free speech and association were violated by Hasford's conduct, the Court now must determine whether these rights were "clearly established" on the dates of Hasford's entries into the MIMICS offices.  "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982).

The Court is convinced that Plaintiffs' rights to free speech and free association, as implicated by the facts of this case, were clearly established at the time of Defendant Hasford's entries into the MIMICS offices.  Any speech critical of Hasford's conduct as a public official -- here, a building inspector -- undoubtedly comes within the First Amendment's protection of speech concerning matters of "public concern," as articulated broadly by the Supreme Court in

1983. *Connick v. Meyers*, 461 U.S. 138 (1983). Subsequent decisions of the Tenth Circuit Court of Appeals have elaborated further on this principle, clarifying that speech made in private may still come within the definition of "public concern," *Lee v. Nicholl*, 197 F.3d 1291, 1295 (10th Cir. 1991), and that speech combining personal grievances with revelations of "corruption, impropriety, or other malfeasance," *Conaway v. Smith*, 853 F.2d 789, 796 (10th Cir. 1988) is protected so long as the speaker sought to achieve a "broader public purpose," *Gardetto v. Mason*, 100 F.3d 803, 812 (10th Cir. 1996); *see also Connick*, 461 U.S. at 149.

Likewise, Plaintiffs' right to political association was also well established at the time of Hasford's conduct. Plaintiffs' claimed political association took the form of support for Morrow's views when he served on the Planning & Zoning Commission and on the Village Council, as well as support for Morrow in his subsequent electoral campaign. For the narrow legal issue presented by these facts, the Tenth Circuit's opinion in *Bass v. Richards*, 308 F.3d 1081 (2002), is directly on point. In that case, a reserve deputy brought a § 1983 action alleging retaliation by his superiors, including the sheriff, for having spoken privately to several individuals about his support for the political philosophy of the sheriff's campaign rival. The rival, however, had not announced his candidacy when plaintiff had made his speech. The Tenth Circuit found that the plaintiff had asserted a viable claim for violations of both his rights to free speech and free association and that these rights were clearly established at the time of the retaliatory conduct, defeating defendant's qualified immunity challenge. In concluding that plaintiff's political association was clearly established, the court explained:

> Bass, like the partisans in *Elrod* [*v. Burns*, 427 U.S. 507 (1976)] and *Branti* [*v. Finkel*, 445 U.S. 507 (1980)], suffered an adverse employment action because his political alignment and beliefs were at odds with his employer's. The plaintiffs in those cases were not required to demonstrate that they suffered an adverse

-29-

employment action because of their support for an actual candidate. Rather, it was sufficient that they were fired for failing to endorse or pledge allegiance to a particular political ideology. ... Bass was fired for the same reason: he did not change his personal belief that an individual with Vorhies' philosophy would make a better sheriff than Sheriff Richards. Because a reasonable official would understand that Bass' commission could not be removed simply because of his political alignment and beliefs, Appellants are not entitled to qualified immunity from the association claim.

*Bass*, 308 F.3d at 1091. Although the present case does not involve a case of adverse employment consequences, it does raise the question of whether the right to political association, as understood to include "political alignment and beliefs" and not just endorsement of electoral candidates, was clearly established as early as December 1996. Thus, the *Bass* analysis and conclusion that this right was sufficiently defined - based on caselaw from as much as twenty-five years ago - applies with equal force to the present case.

The Court also finds that a reasonable state actor would have understood Hasford's conduct to be violative of Plaintiffs' First Amendment rights. The Court does not believe that "officers of reasonable competence could disagree," *Malley v. Briggs*, 475 U.S. 335, 341 (1986), that taking action for the purpose of targeting Plaintiffs for their speech and/or association with Morrow is behavior countenanced by the Constitution.

Accordingly, the Court concludes that Defendant Hasford is not entitled to qualified immunity on Plaintiffs' claim of retaliation in violation of their First Amendment rights to free speech and free association.

## B. Equal Protection claim

In their allegation of unconstitutional unequal treatment, Plaintiffs state that Defendants' actions towards them "were carried out arbitrarily, capriciously, in spite, ill will [sic] and with a malignant animosity," and that Plaintiffs "were singled out and not treated like other similarly

situated businesses in Angel Fire."  (First Amended Complaint at ¶59.)

**1.  Whether Plaintiffs' allegations establish that Hasford violated their Equal Protection rights**

The constitutional guarantees of equal protection are violated when the government treats one individual differently from another who is similarly situated.  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  Although Plaintiffs here have not alleged either that they are members of a constitutionally protected class or that any of their fundamental rights have been violated, viable equal protection claims may be brought by a "'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) (citations omitted); *see also Buckley Constr., Inc. v. Shawnee Civic & Cultural Dev. Auth.,* 933 F.2d 853, 859 (10th Cir. 1991) (citing *Snowden v. Hughes*, 321 U.S. 1, 8 (1944)) (equal protection clause may be invoked by individual not claiming to be member of any class of people, where plaintiff alleges "an element of intentional or purposeful discrimination").  The Tenth Circuit has held that, to prevail on such a claim, a plaintiff must show (a) "that the action taken by the state, whether in the form of prosecution or otherwise, was a spiteful effort to get [plaintiff] for reasons wholly unrelated to any legitimate state objective," and (b) that the plaintiff "was treated differently than another who is similarly situated."  *Bartell v. Aurora Pub. Sch.*, 263 F.3d 1143, 1149 (10th Cir. 2001) (quotations and citations omitted).

**a.  Whether Hasford's actions were "a spiteful effort" at targeting Plaintiffs for reasons unrelated to any legitimate state purpose**

As with the analysis required for Plaintiffs' First Amendment claims, the Court must

inquire into Defendant Hasford's intent in evaluating the adequacy of their equal protection claim. As such, the Court must again go through the two step inquiry, asking first whether Hasford has made a prima facie showing that his conduct was objectively reasonable and, if this burden is met, whether Plaintiffs have demonstrated that Hasford nevertheless acted with a "culpable" state of mind.

### i.  Has Hasford shown prima facie evidence that his conduct was objectively reasonable?

Contrary to Defendant Hasford's reading of Plaintiffs' claims, the complained of treatment does not refer only to alleged inspections of MIMICS based on suspected code violations or alleged citations issued to Plaintiffs for actual violations.  Rather, Plaintiffs charge that Hasford subjected them to months of unwarranted "scrutiny," as seen in his entries into MIMICS without consent, his report of purported code violations to NM CID, and numerous inspection or quasi-inspections.

The Court previously concluded that Hasford has not presented any objectively reasonable explanation for his entries into the MIMICS offices in December 1996 and January 1997. Because Hasford has not met his burden on this matter, Plaintiffs prevail under the first part of the equal protection inquiry (i.e., whether the entries were a "spiteful" targeting of Plaintiffs, unjustified by any legitimate official purpose) .

As for submitting purported code violations to NM CID, Hasford states that, unlike in previous inspections, he was required to turn over a report to the NM CID on this occasion because of a change in how the inspection was conducted -- namely, in this particular case, NM CID had taken responsibility for the matter away from the Village building inspector.  (Def.

Hasford's Reply in Supp. of Hasford's Summ. J. Mot. [Doc. No. 209] at 11-12.)  However, this contention is belied by Hasford's own deposition testimony that he in fact was not required or even asked to prepare a report of the violations and that he sent them to NM CID of his own accord.  (Hasford Depo. dated 4/6/00, Exhibit A to [Doc. No. 209] at 96-97.)  Nevertheless, the Court believes that this conduct was objectively reasonable.  Fermin Aragon, NM CID Bureau Chief, stated that he had received complaints about Morrow and the RCC space Morrow had leased to Plaintiffs.  Regardless of whether Hasford was required by law or policy to send NM CID a report, the Court finds it would be reasonable for a town's building inspector to send his observations about code violations to a superior agency when the agency has had on-going complaints made about a particular site.

### ii.  Have Plaintiffs presented evidence of Hasford's "culpable state of mind"?

While Hasford may have been reasonable in sending NM CID a report after the inspection, Plaintiffs have provided the Court with evidence suggesting that Hasford was motivated by an intent to unfairly target or harass them.  Hasford sent the list of code violations not only to NM CID, but also to the Village Governing Body, and a Fire Investigator.  Morrow has stated that no building inspector before or after that date had ever taken such action.  (Bob Morrow Decl. dated 12/2/01, Exhibit 2 to [Doc. No. 203] at ¶16.)  Plaintiffs also have alleged that, at the inspection in question, NM CID officials personally stated that there were no serious code violations or problems with MIMICS's occupancy.  Additionally, even though Hasford's own deposition testimony indicates that he was concerned with violations at the RCC space, it was not normal for him to discuss building violations with tenants of a leased space where he knew the lessor – particularly when the lessor was the individual responsible for any work done in the building – yet

-33-

with regard to Plaintiffs, he repeatedly raised such issues with them and not Morrow.  (Hasford Depo. dated 11/8/01, Exhibit A to [Doc. No. 209] at 216-17.)  Finally, both Morrow and Libbey have attested that no other business was subjected to the number of formal or informal inspections or degree of scrutiny that MIMICS and the Wildgrubes were.  Taking this evidence to be true on the present motion, the Court concludes that Plaintiffs have marshaled sufficient evidence that Hasford's actions were taken with a "culpable state of mind."

### b.  Whether Plaintiffs were treated differently from others similarly situated

The Court finds that Plaintiffs have shown that they were treated differently than other similarly situated businesses and proprietors.

As for Hasford's December 1996 and January 1997 entries into the MIMICS offices, Hasford's testimony is inconsistent as to whether he ever conducted such warrantless, nonconsensual entries into other commercial premises that were comparable to MIMICS.  At one point, he states that he had a practice of entering into nonresidential buildings in his official capacity without a warrant and without consent.  However in another deposition, when asked whether he had made any warrantless, nonconsensual entries onto commercial premises after work hours before December 1996, Defendant states that he did not.  (*Compare* Charles Hasford Depo. dated 11/8/01, Exhibit A to [Doc. No. 201] at 189-90, 205 (recalling having made such entries previously and this was his practice or custom), *with* Charles Hasford Depo. dated 4/6/00, Exhibit A to [Doc. No. 201] at 64 (having no recollection of making such an entry before MIMICS).)

As for Plaintiffs' contention that MIMICS was subjected to an unusual number and degree of investigation, Linda Libbey has identified at least ten businesses comparable to MIMICS that

were subjected to fewer, if any, inspections, even though all violated one or another building ordinance, including some of the same regulations with which MIMICS failed to comply. Hasford claims that the ten business identified by Plaintiffs for comparative purposes were either not similarly situated or were not treated differently from MIMICS. (Def. Hasford's Mem. in Supp. of Summ. J. [Doc. No. 195] at 13-14.) Elaborating further, Hasford states that Plaintiffs "have not and cannot point to a business in Angel Fire which [he] failed to inspect even though he had reason to suspect building code violations" and that any claim that other businesses were not cited for violations is unavailing "because Hasford never cited plaintiffs for any building or zoning violations while he was building inspector." (Def. Hasford's Memo. in Supp. of Summ. J. [Doc. No. 195] at 14.) While Hasford may not have formally cited any Village business, he did publish a list of purported violations by MIMICS and the Wildgrubes to NM CID and local officials; Plaintiffs have alleged, and Defendant Hasford does not dispute, that he never took such action with any of the other businesses identified as comparable to MIMCS.

Moreover, the claim of disparate treatment is not that MIMICS was issued formal citations while others were not, but that MIMICS was subjected to inspections that others were not and was told by Hasford that it must meet local building codes, while other businesses were permitted to maintain offices that violated the code. Hasford does not dispute, and the Court finds no evidence contradicting, the allegations of Morrow, Libbey, and the Wildegrubes that other businesses were often allowed to remain in violation of building codes while MIMICS was constantly monitored and told to meet code requirements. (*See, e.g.,* Bob Morrow Decl. dated 12/2/01, Exhibit 2 to [Doc. No. 203] at ¶16; Linda Libbey Decl. dated 2/14/01, Exhibit 3 to [Doc. No. 105] at ¶23.)

**2. Were Plaintiffs' equal protection rights "clearly established" at the time of Hasford's conduct?**

There is no doubt that Plaintiffs' rights to equal protection were clearly established well before Hasford's conduct took place. *See, e.g., City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985); *Snowden v. Hughes*, 321 U.S. 1 (1944); *Buckley Constr., Inc. v. Shawnee Civic & Cultural Dev. Auth.,* 933 F.2d 853, 859 (10th Cir. 1991). The Court is equally certain that a reasonable state actor would have known that treating Plaintiffs differently from other similarly situated businesses by subjecting Plaintiffs to greater official scrutiny or by engaging in surreptitious warrantless entries is conduct that runs afoul of the Constitution.

Thus, the Court concludes that Plaintiffs have presented enough evidence on their equal protection claim to survive Hasford's motion for summary judgment based on qualified immunity.

**C. Fourth Amendment claim**

Plaintiffs claim that their Fourth Amendment rights were violated by Hasford's two, allegedly unlawful entries into the MIMICS offices. Hasford argues that the entries are unactionable because (1) he never conducted a "search" once he entered the premises and the Fourth Amendment is inapplicable to his entry alone, (2) assuming his actions were "searches," they only constituted de minimis intrusions onto Plaintiffs' rights, and (3) he was not required by law to obtain a warrant before entering the offices. The Court will address each of these contentions in turn.

**1. Whether Plaintiffs' allegations establish that Hasford violated their Fourth Amendment rights**

**a. Were Hasford's entries "searches" covered by the Fourth Amendment?**

-36-

Government conduct constitutes a "search" for purposes of the Fourth Amendment only "when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).  The Fourth Amendment's protections against unreasonable searches and seizures apply to official conduct involving commercial establishments as well as residential premises, because a proprietor has some reasonable expectation of privacy in the premises.  *See, e.g., See v. City of Seattle*, 387 U.S. 541, 543 (1967) ("The businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property.")  Although typically "there is a lesser expectation of privacy in commercial as contrasted with residential buildings, classifying a building as 'commercial' is not dispositive as to the level of privacy that attaches to such premises."  *United States v. Bute*, 43 F.3d 531, 536 (10th Cir. 1994) (citation omitted).  Furthermore, not all businesses are afforded the same degree of privacy.  *Id.* at 536-37.  Indeed, "the reasonable expectation of privacy in any given property turns on the particular nature and circumstances surrounding the place to be searched."  *Id.* at 536 (citations omitted).  Accordingly, the Tenth Circuit has noted that a proprietor who invites the general public to enter the premises has a lesser expectation of privacy than a person who operates a business in a commercial building closed to the public, such as a warehouse.  *Id.* at 537.

The facts of this case clearly demonstrate that Plaintiffs possessed an expectation of privacy in the MIMICS offices that society would find reasonable.  MIMICS is a small software development company whose primary clientele are small to medium financial institutions.  (*See, e.g.*, Richard Wildgrube Decl. dated 11/9/01, Exhibit 2 to [Doc. No. 193] at ¶¶1, 9.)  Plaintiffs have stated that when MIMICS was located at the RCC space, the offices were closed to the

public and that no signs or other indications were posted outside the office suggesting that the public could enter.  All business was conducted by telephone, modem, and fax, or when the MIMICS employees made site visits to their clients; customers never came to the MIMICS offices for any purpose.  Additionally, MIMICS did not receive mail at the RCC space, but had it sent to the post office instead.  (Richard Wildgrube Decl. dated 11/9/01, Exhibit 2 to [Doc. No. 193] at ¶9.)  In other words, Plaintiffs conducted business in the MIMICS offices much as would the operator of a warehouse.  MIMICS had no showroom or other area open to the general public; even its own clients never set foot inside the office.

The nature of the MIMICS business (namely, software development and support) is such that it is reasonable for Plaintiffs to have an office where there is little or no traffic by the public or their own clients.  Their work can be done with minimal personal interaction with their clients in the MIMICS offices itself.  Thus, the Court finds that Plaintiffs demonstrated an expectation of privacy in the MIMICS offices and that such an expectation was reasonable, given the type of business being conducted and, with regard to the December 1996 entry, given the time at which Hasford entered the office.  *Accord Bute*, 43 F.3d at 537 (acknowledging greater expectation of privacy in commercial premises after regular business hours) (citing *United States v. Swart*, 679 F.2d 698, 701 (7th Cir. 1982))  Defendant Hasford's conduct undoubtedly infringed upon Plaintiffs' constitutionally protected rights.

**b.  Were Hasford's entries only de minimis and therefore unactionable as constitutional torts?**

Should the Court conclude Hasford's conduct constituted a search, Hasford suggests his warrantless physical entries and his actions once inside were only "minimal" invasions of

Plaintiffs' right to privacy and, therefore, do not rise to the level of constitutional tort. Defendant claims that once inside the MIMICS office space, he only conducted a "cursory search" in order to "check to see if ... unpermitted construction was ongoing." (Def. Hasford's Mem. in Supp. of Summ. J. Mot. [Doc. No. 195] at 20.)

To the extent Hasford contends that Plaintiffs have presented evidence of only a de minimis constitutional violation and no actionable constitutional injury, the Court disagrees. In *Artes-Roy v. City of Aspen*, 31 F.3d 958 (10th Cir. 1994), the Tenth Circuit held that a building inspector who had presumably entered a residence without proper consent by opening the door and stepping into the entryway did not violate the Fourth Amendment because he did not conduct any search or seizure. The court emphasized that the inspector "had already seen what they considered violations of [a previously issued] stop work order, from outside the premises," that the inspector "had a right to approach plaintiff's home to talk to her when he observed from the street workers violating the stop work order," and that "he was not there to inspect or to take into physical custody any person or property." *Id.* at 962.

The facts of the present case are markedly different. Hasford did not observe the violation of any order or any building code before either of his entries into the MIMICS offices. In December, he saw construction materials and a deck outside the office, but as he himself has testified, neither of those required permits. Although Hasford stated that his January 1997 entry was "prompted by a drive by," he does not specify what he saw that caused him to believe he needed to examine or inspect the inside of the office. (Charles Hasford Depo. dated 4/6/00, Exhibit A to [Doc. No. 194] at 74.) Additionally, Defendant Hasford's nonconsensual entry did not take the form of simply stepping into an open door when Plaintiffs were not looking or

-39-

opening a door after having spoken with Plaintiffs, and standing in the entryway for a few

minutes.  It is undisputed that on both occasions in question, Hasford sought entry to examine the

interior of the premises and not, as in *Artes-Roy*, to discuss his observations with anyone who

might be present.  Finally, during both incidents, after entering the premises surreptitiously,

Hasford wandered around the office space looking for building code violations and was well past

any initial entryway or vestibule before being stopped by Plaintiffs.  (Charles Hasford Depo. dated

4/6/00, Exhibit 16 to [Doc. No. 134], at 56-57, 66-67, 76-77; Charles Hasford Depo. dated

11/08/01, Exhibit 11 to [Doc. No. 203] at 59-61.)  Reading the evidence in the light most

favorable to Plaintiffs, the Court finds that Hasford's two nonconsensual entries were more than

"de minimis" encroachments on Plaintiffs' rights and that the conduct is actionable under 42

U.S.C. § 1983.[10]

### c.  Was Hasford required to obtain a warrant before entering?

Aside from disputing that he engaged in any conduct that can be considered a Fourth

Amendment search, Hasford argues that Plaintiffs' claim must fail because they "have no evidence

that Hasford continued to attempt to inspect the MIMICS offices on either occasion without a

---

[10]Although an officer's intent is not relevant in deciding whether the Fourth Amendment applies, *see, e.g., Soldal v. Cook County*, 506 U.S. 56, 69 (1992) (officer's purpose irrelevant to threshold question of whether seizure is covered by Fourth Amendment), the Tenth Circuit has considered intent in deciding whether action already presumed to be a search may be actionable as a constitutional tort.  To the extent that the Tenth Circuit in *Artes-Roy* took cognizance of the building inspector's intentions when deciding whether his entry into the home was only a de minimis constitutional violation, this Court notes that what Hasford's purpose was in entering MIMICS in the present case is unclear from the evidence so far.  Hasford has made contradictory statements on this issue, as discussed in Section I.A.1.c.  Regardless, the Court finds that in light of the physical scope of Hasford's entries, the nonconsensual manner in which they were conducted, and the statement by Hasford that he sought to check if additional construction was occurring that would warrant a permit, the Court finds the intrusion to be actionable as a constitutional wrong.

warrant after plaintiffs refused to consent to his inspection."  Hasford assumes that building inspectors are required to obtain a warrant only *after* the proprietor of a business refuses consent to a search.  In this case, he argues his warrantless entries into the MIMICS offices were justified because he had "reasonable grounds to at least check if other unpermitted construction was ongoing, especially in light of [the landlord's] record of performing unlicensed construction." (Def. Hasford's Mem. in Supp. of Summ. J. Mot. [Doc. No. 195] at 20.)

Hasford's position is untenable.  The development of the rule first announced in *Camara v. Municipal Court of the City and County of San Francisco*, 387 U.S. 523 (1967) and *See v. City of Seattle*, 387 U.S. 541, 543 (1967), makes clear that Hasford's warrantless entries into the MIMICS offices without Plaintiffs' consent was unconstitutional.

In *Camara*, the Court struck a San Francisco ordinance that permitted various city employees (in that case, housing inspectors) to "enter, at reasonable times, any building, structure, or premises in the City to perform any duty imposed upon them by the Municipal Code," as long as they presented their credentials.  *Camara*, 387 U.S. at 526 (quoting ordinance).  In concluding that warrants were required before housing inspections could be conducted pursuant to this ordinance, the Court explained, "administrative searches of the kind at issue here are significant intrusions upon the interests protected by the Fourth Amendment, [and] such searches when authorized and conducted without a warrant procedure lack the traditional safeguards which the Fourth Amendment guarantees to the individual...."  *Id.* at 534.  Far from holding that a warrant was required only after permission to conduct an administrative search had been denied, the Court merely observed that, "*as a practical matter*," warrants would be sought after entry was refused since, "in the case of most routine area inspections, there is no compelling urgency to inspect at a

particular time or on a particular day" and "most citizens allow inspections of their property without a warrant." *Id.* at 539 (emphasis added). Hasford confuses the Court's prediction as to when warrants would probably be sought with the Court's holding as to whether one was required.

The Court extended the rule announced in *Camara* to comparable administrative inspections of commercial premises in *See.* In that case, the Court overturned a Seattle ordinance authorizing the "Fire Chief to inspect and ... enter all buildings and premises, except the interiors of dwellings, as often as may be necessary for the purpose of ascertaining and causing to be corrected any conditions liable to cause fire, or any violations of the provisions of this Title, and of any other ordinance concerning fire hazards." *See*, 387 U.S. at 541 (quoting ordinance). The Court noted that, as in *Camara*, an individual's Fourth Amendment rights are "placed in jeopardy if the decision to enter and inspect [private commercial property] for violation of regulatory laws can be made and enforced by the inspector in the field without official authority evidenced by a warrant." *Id.* at 543. The Court unequivocally stated that "administrative *entry*, *without consent*, upon the portions of commercial premises which are *not open to the public* may only be compelled through prosecution or *physical force* within the framework of a warrant procedure." *Id.* at 545 (footnote omitted)(emphasis added).

Neither the fact that Defendant Hasford did not kick down the outer door in effecting his entry into the MIMICS offices nor the fact that Plaintiffs were not subjected to criminal prosecution after they asked Hasford to leave the office removes his conduct from application of this rule. The Court has found other regulations permitting warrantless administrative searches unconstitutional, even though there was no threat of criminal prosecution on the facts of the case.

*See, e.g., Marshall v. Barlow's*, 436 U.S. 307 (1978) (finding unconstitutional OSHA provision permitting warrantless search of nonpublic work areas in workplaces under OSHA jurisdiction, even though, as Supreme Court noted, refusal to permit search would not give grounds for criminal prosecution under statute). The Court itself has stressed that the threat of criminal liability was not the dispositive factor in the *Camara-See* line of cases: "It is plain to us that those cases turned upon the effort of the government inspectors to make non-consensual entries into areas not open to the public." *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 414 (1984) (citing *Camara, See,* and *Barlow's*); *see also Barlow's*, 436 U.S. at 314-15 (describing "critical fact" in case as fact that party seeking nonconsensual entry was government agent).

Hasford would have this Court read the word "nonconsensual" as encompassing only situations where an owner *refuses* to permit a search, as opposed to cases where, as here, the owner is not present to say yes or no. Under Hasford's interpretation, the Fourth Amendment would offer no protection at all, since an officer seeking administrative entry could avoid triggering the warrant requirement by simply attempting to enter when the proprietor was not present and therefore unavailable to refuse.

Accordingly, Hasford was required to obtain a warrant before entering the MIMICS offices without Plaintiffs' consent since, assuming Plaintiffs' allegations to be true, Hasford's purpose was to look for building code violations. *See also Artes-Roy v. City of Aspen*, 31 F.3d 958, 963 n.6 (10th Cir. 1994) (discussed *supra* note 9). As Hasford does not argue that some exception to the warrant requirement is applicable here, the Court finds that Plaintiffs' allegations adequately demonstrate that Hasford's conduct violated their Fourth Amendment rights.

-43-

**2. Whether Plaintiffs' Fourth Amendment right to be free from nonconsensual, warrantless entries to conduct administrative searches was clearly established**

*Camara* and *See* clearly stated that warrants were necessary before entry could be made by government officials to conduct an administrative search of premises not open to the public. Although Hasford has argued that those cases turned on the criminal prosecution of the resident or proprietor who refused to agree to the search, such a reading of the law is impossible to maintain in light of subsequent caselaw, as discussed in Section I.C.1.c, *supra*. Moreover, the Court cannot say that a reasonable officer would believe the Constitution permits warrantless entries into commercial spaces inaccessible to the public any time the proprietor is unavailable to allow (or deny) entry. The practical effect of such a rule would be to eliminate the warrant requirement in its entirety and give rise to the possibility of routine, nonconsensual entries into office spaces whenever the owner was not present.

As for Defendant Hasford's possible reliance on Village Ordinance 1990-3, the Supreme Court has stated that reliance on laws that are patently unconstitutional cannot render an officer's actions immune. In light of the fact that the Village Ordinance is virtually identical to the provisions found unconstitutional by the Supreme Court in *Camara* and *See*, *see discussion infra* Section II.C.,* the infirmity of the Angel Fire ordinance should have been obvious. On all accounts, Defendant Hasford was on "fair notice" that this statute and the conduct Hasford took under its authority went well beyond the bounds of constitutionally permissible action by a state officer. Thus the Court finds that Plaintiffs' allegations of a Fourth Amendment violation survive Defendant Hasford's motion for qualified immunity.

## II.   Summary Judgment Motions

The Court will now consider whether Defendant Hasford is entitled to summary judgment on any of Plaintiffs' claims under a traditional summary judgment analysis.  The Court also will determine whether Defendants Village of Angel Fire, McKinley and Stansbury have established grounds for summary judgment on the claims brought against them and whether Plaintiffs have shown that they are entitled to summary judgment on the Fourth Amendment claims against Defendants Hasford and Village of Angel Fire.

### A.   First Amendment retaliation

Defendants Village of Angel Fire, McKinley and Stansbury seek summary judgment on Plaintiffs' claim of unlawful retaliation in violation of their rights to free speech and free association on the grounds that neither the speech nor the association for which Plaintiffs allegedly were retaliated against are constitutionally protected.  These Defendants make the same argument as did Defendant Hasford in his qualified immunity motion -- namely, that Plaintiffs engaged in no constitutionally protected speech and association at the time in question and that therefore their claim fails as a matter of law -- and provide no additional factual or legal argument in support of their motion.  For the reasons cited in Section I.A. *supra*, the Court concludes that a rational trier of fact could infer from the evidence that (1) Plaintiffs' association with Morrow extended beyond a mere casual social or business relationship and was at least partly "political" in nature, and (2) Plaintiffs' speech discussing Hasford's violation of NMSA 1978, § 60-13-8 and his unannounced warrantless entries into MIMICS were of public concern.

Accordingly, all Defendants' motions for summary judgment on Plaintiffs' First Amendment retaliation claim must be denied.

**B. Equal Protection claim**

A party sufficiently establishes an equal protection violation when she provides proof that the state action was "a spiteful effort to get [plaintiff] for reasons wholly unrelated to any legitimate state objective" and that the plaintiff "was treated differently than another who is similarly situated." *Bartell v. Aurora Pub. Sch.*, 263 F.3d 1143, 1149 (10th Cir. 2001) (quotations and citations omitted).

Defendants Village of Angel Fire, McKinley and Stansbury's sole reason for requesting summary judgment on Plaintiffs' equal protection claim is an alleged total lack of evidence in support of the claim that Plaintiffs were treated differently from others comparably situated. Plaintiffs respond by relying on statements of Councilmember Morrow and former P&Z Commission Chair Linda Libbey that businesses similar to MIMICS were treated differently. However, looking to the excerpted portion of Councilmember Morrow's deposition on which Plaintiffs rely, the Court can find no such statement. The only time Morrow mentions another business is while giving an example of a business that was treated in the *same manner* as MIMICS. In the excerpt, Morrow first notes that Village Ordinance 88-11 provided that if use of a property did not conform with the applicable zoning regulations in place as of a certain date, such "nonconforming use" would be permitted to continue so long as such use was not discontinued or abandoned for six consecutive months. Morrow then attests that MIMCS was exempted from this provision and therefore allowed to continue nonconforming use even though the property had not been used for commercial purposes for longer than six consecutive months.

-46-

Morrow next states that another property – formerly known as Camp Burger, later known as Erlenes – was also afforded such an exemption.  (Bob Morrow Depo. dated 1/2/01, Exhibit 4 to [Doc. No. 105], at 148-55.)  Nowhere in the deposition excerpt provided to the Court does Morrow discuss whether Camp Burger or Erlenes were subjected to the same investigations that the MIMICS offices were.  Indeed, to the extent that Morrow mentions Camp Burger, the two business appear to have been treated alike.

The statements provided by Linda Libbey are more availing.  As noted in Section I.B.1.b. *supra*, Libbey has identified at least ten businesses that were similarly situated to MIMICS but that were treated differently in that they were not subjected to the same number of inspections or degree of scrutiny by either Hasford or by members of the Village Council.  Defendants Village of Angel Fire, McKinley and Stansbury have not provided any evidence showing either that these businesses actually were treated in the same manner as MIMICS or that these businesses are not comparable to MIMICS.[11]

Moreover, the evidence before the Court yields other examples of unequal treatment.

---

[11]In their reply brief, Defendants Village of Angel Fire, McKinley and Stansbury also argue that they are entitled to summary judgment because Plaintiffs have not established that any of the businesses mentioned by Libbey were similar to MIMICS.  (Defs.' Reply in Supp. of Defs.' Summ. J. Mot. [Doc. No. 141] at 10.)  However, Defendants have pointed to no evidence in the record suggesting that these businesses are *not* comparable to MIMICS.  In the case on which Defendants rely, *Crider v. Board of County Commissioners of the County of Boulder*, 246 F.3d 1285 (10th Cir. 2001), the record contained facts that distinguished plaintiffs from their allegedly similar counterparts.  In the case at bar, Defendants have not pointed to and the Court does not find any evidence that gives grounds for distinguishing MIMICS from the businesses cited by Libbey.  Since all evidence must be read in the light most favorable to Plaintiffs on the present motion, the Court finds it reasonable to infer that the comparison made by Plaintiffs is appropriate, given the absence of evidence to the contrary.  At the very least, the parties' disagreement as to whether the evidence cited by Plaintiffs actually reflects "similarly situated" businesses raises a question of material fact, precluding summary judgment on Plaintiffs' equal protection claim.

Morrow has stated that although the members of the Village Council did not normally concern themselves with "occupancy matters," the Council - notably Defendants Stansbury and McKinley - did become involved in those issues as they pertained to MIMICS.  (Bob Morrow Decl. dated 12/2/01, Exhibit 2 to [Doc. No. 203] at ¶16.)  Thus, the Court concludes that Plaintiffs have provided sufficient evidence of disparate treatment to survive Defendants Village of Angel Fire, McKinley and Stansbury's summary judgment motion on the equal protection claim.

With regard to Defendant Hasford's motion, Court finds that the information provided by Linda Libbey, to the extent it indicates that Hasford participated in the disparate treatment of MIMICS as compared to other similarly situated businesses, also gives adequate grounds for denying Hasford summary judgment.  As for Hasford's two entries into the MIMICS offices, the Court finds that the record contains contradictory statements as to whether Hasford undertook such entries with other commercial property under comparable circumstances while building inspector.  As noted earlier, Hasford has stated in separate depositions that he did have a practice of entering into commercial spaces in his official capacity without a warrant and without consent, and also that he had never made a warrantless, nonconsensual entry into a business after work hours before his December 1996 entry into the MIMICS offices.  Thus, on the question of whether his entries constituted disparate treatment, material facts remain in dispute, warranting a denial of summary judgment.

### C.     Fourth Amendment claim

Plaintiffs claim their Fourth Amendment rights were violated as a result of Village Ordinance 1990-3, which authorized the Village building inspector to conduct warrantless inspections, or in the alternate, as a result of the Village's "custom, policy, procedure or practice

-48-

of allowing its building inspector to enter homes and businesses without a warrant and without exigent circumstances for the purpose of conducting an inspection." (First Amended Complaint at ¶¶64, 65.) Plaintiffs also allege that their Fourth Amendment rights were violated when Defendant Hasford entered the MIMICS property in December 1996 and January 1997 to commence a search, without a warrant, consent, or exigent circumstances. Plaintiffs have filed a motion for summary judgment on this claim, as have Defendant Village of Angel Fire and Defendant Hasford.

The Village argues that Plaintiffs have not alleged a Fourth Amendment violation because the Constitution does not require a warrant for an administrative entry into commercial premises unless the proprietor has refused consent to conduct a search. As in Defendant Hasford's motion for qualified immunity, the Village contends that, because Hasford did not attempt to conduct a search once the Plaintiffs asked him to leave during his two entries into MIMICS and because Ordinance 1990-3 does not authorize warrantless searches in the face of such refusal, no constitutional injury exists on the facts. However, Defendants' attempt to draw a constitutionally significant distinction on the facts of this case between warrantless entry and warrantless search are unavailing. As discussed in Section I.C.1.c *supra*, the Supreme Court has interpreted the Fourth Amendment as protecting proprietors against both such forms of state intrusion.

Although the Village of Angel Fire relies on *Marshall v. Barlow's Inc.,* 436 U.S. 307 (1978), for the proposition that "[t]he Fourth Amendment does not require a warrant before a building inspector may enter a business unless the owner or occupant refuses to consent to allowing the search" (Defs.' Mem. in Supp. of Summ. J. Mot. [Doc. No. 131] at 14), such a reading of *Barlow's* and the related line of cases is unnecessarily narrow. In *Barlow's,* the Court

-49-

held that a warrant is required before government agents may inspect nonpublic work areas of

businesses covered by Section 8(a) of the Occupational Safety and Health Act of 1970 (OSHA).[12]

Although the facts of that case involved an attempt by government agents to carry out their

inspection over the business owner's refusal, the Court did not state that warrants must be issued

only after such refusal was issued by the owner.  Rather, the Court found OSHA "unconstitutional

insofar as it purports to authorize inspections without warrant or its equivalent."  *Barlow's*, 436

U.S. at 325.  That Defendant's reading of *Barlow's* is without foundation is evident from the

cases leading up to and that flowed from that decision, as elaborated in Section I.B.1.c. *supra*

(discussing *Camara-See* line of cases).

Moreover, there is little need to infer how the rule announced in those cases would apply

to Village Ordinance 1990-3 since it is nearly identical to the housing code provision found

unconstitutional in *Camara*  and the Seattle Fire Code overturned in *See*.  The San Francisco

ordinance at issue in *Camara* stated,

> RIGHT TO ENTER BUILDING.  Authorized employees of the City departments
> or City agencies, so far as may be necessary for the performance of their duties,
> shall, upon presentation of proper credentials, have the right to enter, at reasonable
> times, any building, structure, or premises in the City to perform any duty imposed
> upon them by the Municipal Code.

*Camara*, 387 U.S. at 526.

The comparable Seattle ordinance overturned by the Supreme Court in *See* provided as follows:

> INSPECTION OF BUILDING AND PREMISES.  It shall be the duty of the Fire

---

[12]Section 8(a) provided that, "upon presenting appropriate credentials," agents were
authorized "to enter without delay and at reasonable times" premises covered by OSHA and "to
inspect and investigate during regular working hours and at other reasonable times, and within
reasonable limits and in a reasonable manner" such places of employment.  84 Stat. 1598, 29
U.S.C. § 657(a) (quoted in *Barlow's*, 436 U.S. at 308, n.1.)

> Chief to inspect and he may enter all buildings and premises, except the interiors of
> dwellings, as often as may be necessary for the purpose of ascertaining and causing
> to be corrected any conditions liable to cause fire, or any violations of the
> provisions of this Title, and of any other ordinance concerning fire hazards.

*See*, 387 U.S. at 541.

The Supreme Court concluded that both of these ordinances left too much discretion in the hands

of the individual seeking entry to execute the authorized search or inspection.  Of concern to the

Court was the specter of nonconsensual entries, by government agents, into areas not accessible

to the public.  Ordinance 1990-3 raises the same problems both on its face and in how it was

applied by Hasford to Plaintiffs.  In relevant part, the Angel Fire ordinance states

> It shall be the duty of the Building Inspector to examine all applications for
> building permits and *to inspect at such intervals as he or she deems appropriate*,
> all ongoing construction within the Village of Angel Fire in order to ascertain
> compliance with the building codes and all other applicable ordinances and laws.
> For this purpose, the Building Inspector shall have the *power to seek inspection of
> any property or structure at reasonable hours to determine compliance*.

VILLAGE OF ANGEL FIRE, N.M., ORDINANCE NO. 1990-03 (adopted Sept. 6, 1990).

 In addition, for the reasons discussed in Section I.C.1.b. and footnote 9 *supra,* the

decision of the Tenth Circuit in *Artes-Roy v. City of Aspen*, 31 F.3d 958 (10th Cir. 1994),

suggests that Hasford's actions would be unconstitutional if he intended to search the premises

for building code violations.  The Court has been presented with contradictory evidence as to

Hasford's purpose in entering the MIMICS offices.  As a preliminary matter, the Court notes that

Hasford has stated in his motion papers that he "does not dispute that he entered MIMICS to

inspect for potential building code violations" (Def. Hasford's Resp. to Pls.' Summ. J. Mot. [Doc.

No. 201] at 9) and that his intent in entering MIMICS was to "look for evidence of unpermitted

or unlicensed contracting to determine whether he needed to make an inspection as Building

Inspector" (Def. Hasford's Mot. for SJ, [Doc. No. 195] at 20). Yet in his deposition testimony, Hasford states that he "wasn't looking for code violations" and that he actually had entered the office "because [he] saw some materials out front, and [had] stopped to see what was going on" (Charles Hasford Depo. dated 4/6/00, Exhibit A to [Doc. No. 201] at 65). Elsewhere Hasford has stated both that his December 1996 entry was made in order to conduct an "inspection" (Charles Hasford Depo. dated 4/6/00, Exhibit A to [Doc. No. 201], at 57, 60-61) and that he did not consider it an inspection at the time since "[t]he reason I went in there was to see what was going on actually" (Charles Hasford Depo. dated 4/6/00, Exhibit 3 to [Doc. No. 193] at 53).

The Court fails to see the difference between looking for building code violations and looking to determine whether any construction had been done that would have required a permit or license. Even under the reading most favorable to Defendants, the evidence indicates that Hasford conducted his entries in order to determine whether the office space was in compliance with relevant construction and building codes. Because the evidence shows that Hasford admitted himself into the office pursuant to Ordinance 1990-3 without a warrant, without consent, and in the absence of any exigent circumstances in order to determine conformity with applicable building and/or construction codes, the Court finds a grant of summary judgment in favor of Plaintiffs on their Fourth Amendment claims against Defendant Hasford and the Village of Angel Fire is warranted.

### D.    Procedural Due Process claim

Plaintiffs allege that their procedural due process rights were violated when, "[o]n or about September 11, 1997, Defendants Stansbury and McKinley attempted to have the Angel Fire Village Council vote upon a cease and desist order directed toward MIMICS ... without notice to

the Plaintiffs." (First Amended Complaint at ¶71.) Even though Plaintiffs admit that the motion

for the desist order was tabled at this meeting, Plaintiffs allege that their rights to procedural due

process were violated because they "were not provided any opportunity to be heard before the

discussion of the cease and desist order." (First Amended Complaint at ¶73.) Specifically,

Plaintiffs claim that their constitutionally protected rights to occupy the RCC space and to

conduct business were infringed upon when Defendants "Stansbury and McKinley lobbied for a

desist order directed against MIMICS." (First Amended Complaint ¶40.) Defendants argue that

Plaintiffs have not shown that they had any protected property interest in their occupancy at the

RCC space and that, even assuming Plaintiffs possessed such an interest, the actions taken at the

September 11, 1997 Village Council meeting do not rise to the level of a constitutional due

process violation.

      To determine whether an individual has been deprived of her rights to procedural due

process, the Court must engage in a two-part analysis. First, the Court must ask whether the

person "possessed a protected interest giving rise to due process protection." *Garcia v. City of*

*Albuquerque*, 232 F.3d 760, 769 (10th Cir. 2000). If this question is answered in the affirmative,

the Court then must examine "whether the government afforded the individual an appropriate

level of process." *Id.*

      Plaintiffs' claim must fail under this analysis because they have not pointed to any

"deprivation" in the present case. Both parties agree that, although the desist order may have

been discussed at the September 11 meeting, no action was taken at that time. As the Court is

hard pressed to find any action by Defendants that deprived Plaintiffs of any rights, Defendants'

motion for summary judgment on this count will be granted. *Accord Watson v. Univ. of Utah*

*Med. Center*, 75 F.3d 569, 578 (10th Cir. 1996) ("As to plaintiff's allegations that defendants denied her due process with regard to her property right to her nursing license, she has not shown enough: [defendant] took no action to revoke or suspend her license.").

## III.    Partial Motion to Dismiss Amended Complaint

Defendant Hasford also seeks dismissal of Plaintiffs' equal protection and Fourth Amendment claims against him for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  As the Court has granted summary judgment to Plaintiffs on their Fourth Amendment claim, Hasford's motion to dismiss on that count is denied as moot.  Additionally, as the Court has indicated in Section II.B. *supra*, Plaintiffs' allegations of disparate treatment at the hands of Hasford are sufficient and Hasford's own inconsistent deposition testimony has raised questions as to whether he conducted similar warrantless, nonconsensual entries into properties comparable to MIMICS during his tenure as the Village building inspector.  Accordingly, Defendant's motion to dismiss Plaintiff's equal protection claim against Hasford also is denied.


## CONCLUSION


**IT IS THEREFORE ORDERED** that Defendants Village of Angel Fire, Mary Frances McKinley and Gary Stansbury's Motion for Summary Judgment **[Doc. No. 130 & 131]** is **DENIED** as to Counts I, II, and III of Plaintiffs' First Amended Complaint and **GRANTED** as to Count IV; Defendant Charles Hasford's Motion for Summary Judgment **[Doc. No. 194 & 195]** is **DENIED**; Plaintiffs' Motion for Partial Summary Judgment **[Doc. No. 190 & 192]** is

**GRANTED**; and Defendant Charles Hasford's Partial Motion to Dismiss Amended Complaint

**[Doc. No. 118 & 119]** is **DENIED**.


Dated this 12th day of August, 2003.


_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE


<u>Attorney for Plaintiffs</u>:
Michael Schwarz

<u>Attorney for Defendants</u>:
James P. Sullivan
Randy S. Bartell